## EASTERN STEAMSHIP CO. v. INTERNATIONAL HARVESTER CO. OF NEW JERSEY.

## THE JOSEPH WOOD.

## THE INTERNATIONAL.

### No. 3484.

District Court of the United States
N. D. Ohio, E. D.

Feb. 10, 1951.

Leckie, McCreary, Schlitz & Hinslea, Cleveland, Ohio, for libelant.

Johnson, Branand & Jaeger, Cleveland, Ohio, Branand & Whitney, Chicago, Ill., for respondent.

JONES, Chief Judge.

Since my impressions from, and reaction to, the proofs have been reached at the conclusion of the trial, no review or summary of the evidence, with which the parties are familiar, seems necessary.

My findings and conclusions controlling decision briefly may be stated.

Libelant seeks recovery for collision damages based upon the alleged fault of the respondent's vessel International in

several respects when it came into collision with the libelant's vessel Joseph Wood three miles off and below Whitefish Point in Whitefish Bay, Lake Superior on April 23, 1947 at about 5:50 p. m., EST.

The owners of the International deny fault as charged and assert that the collision resulted alone from negligent navigation of the Wood.

The Wood was upbound light but with substantial water ballast; the International was downbound with a cargo of iron ore. There was fog and ice along the courses of each at and around Whitefish Point. The accepted course under ordinary conditions for upbound vessels was 328° about one mile off Whitefish Point and the downbound course under like circumstances was 148° about 2½ miles off the Point. The Lake Carriers Association's recommended courses allowed some latitude to Masters, depending upon weather and other conditions affecting navigation.

When the Wood ran into thick ice about three miles below the Point on a course about 321°, she was compelled to backtrack down her own wake, and elected to re-shape her course to 20° to avoid the thick ice and skirt along its edge. Proceeding at half speed or less for some time and distance, fog horns were heard and some communication was had by radio telephone with the Stanton nearby. Shortly thereafter two blasts were heard from what later turned out to be the International. The Captain, concluding that he could not safely accept a starboard passing, immediately blew danger signals in response, when out of the fog the International appeared about 200 to 250 feet away bearing down on the Wood's port bow well ahead of amidships, and he put his engines hard astern; and then, believing that if he could get her stern around, collision might be averted, the Master of the Wood signaled a hard left wheel which started the vessel swinging, but not enough to escape collision with the International's stern at about the 19th hatchway on the Wood's port side.

The Master of the International testified that although he zig-zagged on account of ice around and below Whitefish Point, the general course of his ship was the established course for downbound vessels; that he had heard fog signals from several ships and had heard one coming closer off his starboard bow, and what turned out to be the Wood's fog signal; whereupon he gave the two-blast starboard passing signal which was promptly answer by danger blasts from the Wood, just as it came out of the fog into his view and across his bow, substantially at right angles. He immediately put his engines hard or full speed astern but the Wood seemed to him to sag into his stern. He believed that the collision would have been avoided if the Wood had kept going, in view of his loss of forward way.

Each boat was said to have proceeded at slow or reduced speed before and at the time of collision, variously estimated by different witnesses as from three to seven miles per hour. Appraisals of the relative speeds as to each other's vessel were given by the respective first mates as three or four miles per hour for the International and six to seven miles per hour for the Wood up to the point of alarm preceding the collision; that is, slow speed for the former and approximately half-speed for the latter.

Generally summarized, the evidence of the International was substantially in accordance with that of the Captain.

Braughton, the lookout on duty in the bow of the International gave what seemed to me to be the clearest and most graphic account of the relative positions and movements of the ships from the time they came into view out of the fog up to the collision. As the ships converged, he testified the Wood was making headway, judging from her stern action and the International had then less and little headway compared with the Wood. He also agree with his Captain's testimony that the Wood's port side seemed to sag or "set down on" the International's bow. Also, he frankly supported the testimony of the Wood that it was on a port wheel at the time of the collision.

Estimates of distances travelled and time elapses between signals generally are

somewhat unreliable, as are estimates of speed just before a collision; and memory and recollection of witnesses are difficult to evaluate, but reasonable and natural inferences must be drawn from them as they seem to be more nearly consistent with the physical facts leading up to the collision and its consequences, and this, I consider to be the basis of and the support for the conclusion hereinafter reached.

The witnesses on each side seemed to me of equal credibility and I believe each undertook to relate what he knew and remembered with frankness and lack of bias, subject to normal human infirmities in judgment and recollection as to events occurring almost three years earlier.

■ While the International, following approximately the usual and recommended downbound course, ordinarily, would have the right to proceed on that course, yet it was required to navigate with due regard to existing circumstances and the likelihood of other vessels passing up or down encountering ice or fog at or near the passing range at Whitefish Point.

To the extent that the Wood was proceeding on a 20° course toward the known and usual course of downbound ships, it was approaching an intersection where it knew that downbound traffic likely would be on the recommended course, and careful and diligent navigation was required, particularly considering the presence of ice and fog. Of course, hazards of fog and ice were conditions and circumstances equally to be assumed and controlling with respect to the navigation of each of these vessels, and the Wood being light, save for water ballast, was easier to navigate in the sense that it would be more responsive to change of speed and course. It seems to me that the Wood, on a 20° course in that location, was in somewhat the position of an automobile travelling on the left-hand side of a boulevarded highway, and was required to look out for the traffic having generally the right of way on the downbound course.

I do not think that the International was required to anticipate that another, or other vessels might be heading on an easterly course of 20° at that point which, if followed, would result in an intersection of the downbound course at approximate right angles; and the Wood reasonably should have anticipated that the downbound vessel likely would be loaded, as it was, and slower to respond to lessened speed and change of course, and that it also would be on the recommended downbound course.

Normally the passing for up and downbound vessels at this point would be to starboard and in the absence of an unusual situation or condition which reasonably should have been anticipated or understood from fog signals previously given, the International's conceded two-blast signal was the proper one to give and to expect.

■ It is my considered judgment from all the evidence as to signals, positions, courses and conditions that the collision was unavoidable when the vessels came in sight of each other out of the fog. There was no last clear chance open then to either vessel; and I can find nothing in the navigation of the International to justify or sustain a finding of negligence or fault. It was the Wood that was having trouble and obstacles to its progress necessitating the adoption of an unusual course which as I have said, if extended, as I think it was, into the downbound course or closely approximate to it, created a hazard to the navigation of other vessels, including the International. Nor do I think the International's Master had reason to believe, prior to the danger signal that the Wood was cutting across his bow as has been urged by the libelant. Unless and until the Captain of the International, in the exercise of due care, was required to anticipate, or due to signals, know, that a vessel was crossing his bow on a 20° course, I would be unable to see how he could be held at fault under the existing circumstances.

While, as libelant argued, the principle of risk of collision may be applicable in the case of fog signals of a vessel coming nearer and nearer with each fog signal, in that the observing vessel in some circumstances would be expected to realize, or

ought to have realized, that the approaching vessel was on an intersecting course, or at least not on a parallel course; yet, under the facts in evidence here, I think the International did all it could do considering its reduced headway which enabled it to come almost to a stop by the reversing of her engines when it became apparent that the Wood was about 22° off its starboard bow and on a course across it.

Although Captain Foster of the Wood gave it as his opinion that considering the relative location of the vessels at the point of collision, the International could not have been on the downbound course, certainly the International was not as far from the recommended course as was the Wood from the upbound course; and even though we accept Captain Foster's opinion in respect of the location of the International, I do not regard it as sufficiently controlling to support fault on the part of the International.

Holding as I do, liability can not be imposed upon the International and its prayer for dismissal of the libel must be sustained.